[Cite as *Boling v. Thacker*, 2019-Ohio-3683.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY**

| | | |
|---|---|---|
| AMANDA BOLING | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 2018-CA-109 |
| | : | |
| v. | : | Trial Court Case No. 2015-JV-29 |
| | : | |
| PRESTON THACKER, et al. | : | (Appeal from Common Pleas Court – |
| | : | Juvenile Division) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 13th day of September, 2019.

. . . . . . . . . . .

VALERIE JUERGENS WILT, Atty. Reg. No. 0040413, 333 North Limestone Street, Suite 202A, Springfield, Ohio 45503
    Attorney for Appellant

STACEY ROBERT PAVLATOS, Atty. Reg. No. 0012392, 700 East High Street, Springfield, Ohio 45505
    Attorney for Appellee

. . . . . . . . . . . .

FROELICH, J.

**{¶ 1}** Father appeals from a September 17, 2018 judgment of the Clark County Court of Common Pleas, Domestic Relations/Juvenile Division, which granted visitation rights to Maternal Grandparents and Mother[1] and from an October 15, 2018 order clarifying its prior judgment regarding grandparent visitation. For the following reasons, the trial court's judgments will be affirmed.

## I. Procedural History

**{¶ 2}** In June 2014, Mother and Father, who were unmarried, had a daughter, W.T. Mother was initially named the custodial parent, and Father had visitation rights. The parties broke up and got back together several times, ultimately ending their relationship in August 2015.

**{¶ 3}** In December 2016, Mother gave birth to a son,[2] who was found to be experiencing withdrawal symptoms; Mother admitted that she was using Percocet that had not been prescribed, and Children Services became involved. In June 2017, Father, who had relocated to Tennessee, filed a motion for legal custody of W.T. and requested permission to relocate W.T. The trial court denied the motion to relocate; the motion for legal custody remained pending. Father's parents moved for legal custody of W.T., and the trial court granted them temporary legal custody. In July 2017, Maternal Grandparents moved for legal custody of W.T. Around the same time, Maternal Grandparents obtained legal custody of Mother's son. The next month, Maternal

---

[1] In addition to the visitation issue, this judgment resolved several motions regarding custody of the child. The only portion of the judgment being challenged on appeal is the portion granting visitation to Maternal Grandparents and parenting time to Mother.

[2] At the time of the son's birth, Mother had a different boyfriend, who was the biological father of this child. Although there was extensive testimony concerning the circumstances surrounding the birth of Mother's son, this action concerns only W.T.

Grandparents filed a motion for visitation with W.T. In August 2017, Mother filed a multi-branch motion, which is not pertinent to this appeal.

{¶ 4} Over ten days in 2017 and 2018, the trial court held a hearing on the various motions by the parties. Father resided with his fiancée, her son, and their new child in Tennessee when the hearings began, but married and relocated to Ohio by the end of the hearings. Ultimately, the trial court granted legal custody of W.T. to Father, and granted Maternal Grandparents extensive visitation rights. Mother was to have supervised parenting time with W.T. when W.T. was with Maternal Grandparents. At Father's request, the trial court filed an additional order clarifying Maternal Grandparents' visitation rights.

{¶ 5} Father appeals, raising three assignments of error. Father claims that the trial court erred, as a matter of law, in granting visitation to Maternal Grandparents, that Maternal Grandparents' visitation times are arbitrary and inconsistent with trial court's factual findings, and that Mother's parenting time is contrary to law and not supported by the evidence.

## II. Trial Court's Factual Findings

{¶ 6} The bulk of the trial court's findings were set forth in the context of the parties' cross-motions for legal custody of W.T. The trial court found that it was not in W.T.'s best interest for Mother to remain the custodial parent and that Father had not abandoned W.T., "despite [Maternal Grandparents'] contentions to the contrary." Addressing Father's suitability, the trial court found, in part:

> * * * To this end, [Father] was not voluntarily absent from [W.T.'s] life for a period in excess of 90 days and, in fact, he regularly exercised his

parenting time with her and stayed in regular communications with her while he was residing in Tennessee. The Court does, however, acknowledge that it was not in [W.T.'s] best interest for [Father] to relocate to Tennessee and leave her to be primarily cared for by [Mother], who he knew had unresolved drug issues. The Court finds, however, from the totality of the credible evidence, that [Father] has since significantly matured as a person and as a parent, and the Court finds that it is unlikely that he will make such an error in judgment in the future. The Court notes that both sets of grandparents either knew, or should have known that [Mother] had unresolved drug dependency issues while primarily caring for [W.T.] which should have resulted in either set of grandparents taking appropriate action to protect [W.T.] in a more timely fashion.

Despite the foregoing, this is not a contest between grandparents. Both sets of grandparents in this case could easily provide [W.T.] with a stable and loving environment to grow up in. That is not, however, the primary responsibility of grandparents, nor should it be. Grandparents should be a great resource and support system to assist their children with the difficulties involved in raising a child in today's world. Both of these sets of grandparents will easily do a great job serving in that capacity.

The Court further notes that both sets of grandparents in this case are closely bonded with [W.T.] because they both have invested more energy in her upbringing than average grandparents do, primarily because of the past deficiencies of their respective children coupled with their

absolute commitment to this child.

In some ways, [W.T.'s] situation is not much different than many cases which this Court sees wherein grandparents step up when their own children are sometimes lacking.

This case is different, however, than many cases in that they both have children who are in the process of reclaiming their own lives which they, for a period of time, threw away to drugs and other irresponsible decisions. As painful as this litigation may have been on [W.T.'s] parents, it may well represent a point in their lives which results in positive change and a new outlook on life.

It is the Court's hope that some day, when this litigation has long since ended, all of the parties in this case will recognize the unknowing way in which this four-year-old little girl made her parents better people. Clearly, both parents in this case have used their love for [W.T.] as a motivating force to effectuate positive changes in their own lives. Both parents and both sets of grandparents should be proud of the efforts that these kids are trying to make at this point in their lives. Both sets of families have been through a lot and so has this child, however, her future is bright in this Court's opinion, particularly if all of the parties can find a middle ground to work together for this child's benefit.

{¶ 7} Addressing the best interest of W.T. with regard to a change of custody, the trial court further found:

[Father] resides with his wife * * * in Enon, Ohio in a house which he

rents from [his step-father]. Also residing there is their son, [H.T.], who was born in August 2017 along with [his wife's] 8-year-old son * * * . [W.T.] also resides there part of the time by agreement between [Father] and [his parents].

[Father] is 31 years of age and [his wife] is 29, and they were married [in] May [ ] 2018. During the pendency of this litigation, they agreed, as a family, to return to this area where [W.T.'s] primary support system resides. This move not only serves [W.T.'s] best interest, but it also is indicative of [Father's] maturity which has evolved in the last few years.

[Father] works for his step-father's construction company at $19 per hour and works a 40-hour week, typically during the daytime and not on weekends. His gross annual earnings are $39,520.

[Father's wife] is a nurse at a dialysis facility where she works Monday, Wednesday and Friday from 5:00 a.m. until 5:00 p.m.

As mentioned previously, both [Mother] and [Father] had unresolved substance abuse issues. [Father] got professional help for his issues at a clinic in 2015 and the credible evidence suggests he has been clean from drugs for approximately three years, all of which is to his credit.

[Father] has a tremendous support system in place in terms of his wife, his mother and step-father to assist him in the rigors of raising a young child in today's world. The Court finds, from the totality of the credible evidence, that [Father] is likely to listen and be guided by those within his support system to make the decisions necessary to serve [W.T.'s] best

interest.

[Mother] resides on her parents' property * * * [in] Fairborn, Ohio. Currently, she is staying in the main house along with her parents and son * * *, who was born [in] December [ ] 2016. Her parents have legal custody of [the son] at this point in time, however [Mother] spends a lot of time with [him] because she resides at the same residence.

Also residing with [Maternal Grandparents] is [maternal grandfather's] cousin's 16-year-old daughter * * * who has developmental issues and is on an IEP program at [her high school].

[Mother] attended an in-house drug treatment program between April 24, 2018 and May 30, 2018 which she completed. Her parents paid the cost of the program, which was approximately $14,000. [Mother] is currently on Suboxone, by prescription, and she is involved in weekly N/A meetings; counseling sessions and drug screens. She submitted a clean hair follicle test to this Court in August, 2018. [Mother] is not currently employed since she devotes most of her free time to recovery. Her parents serve as a tremendous support source for her, and this Court is optimistic that she is on the right track to reclaim her life. She clearly loves her children, and she appears motivated to fix things in her personal life so that she can be a positive part of their lives. Time will tell.

The Court finds, from the totality of the credible evidence, that the living accommodations at all of the parties' respective residences [are] clean and spacious and more than adequate to meet all of [W.T.'s] needs.

The Court further finds, from the totality of the credible evidence, that all of the parties in this case have a close and loving relationship with [W.T.] and she has a great opportunity to develop healthy relationships, remain safe and grow into adulthood with the support of all of the parties who were present at court over the course of this ten-day period.

The Court further finds, from the totality of the credible evidence, that [Father] is likely to adequately attend to all of [W.T.'s] medical, health and future educational needs.

The court has not been provided with sufficient evidence to suggest that any of the parties [has] physical or mental health issues which are unresolved and which would impact their ability to properly parent [W.T.], except as otherwise set forth herein.

The Court finds, from the totality of the credible evidence, that both sets of grandparents and both biological parents have served as primary caregivers for [W.T.] during the time that she spent with each of them.

In terms of credibility, the Court finds that the testimony provided by all of the parties was relatively credible, for the most part.

The Court further finds, from the totality of credible evidence, that [W.T.] has a great opportunity to have positive interaction and interrelationships with friends and relatives while residing with her father, all of which will be beneficial to her future development.

The Court further finds, from the totality of the credible evidence, that [W.T.] is well adjusted to her current home and community, as well as the

home environments on both sides of her family.

* * *

The Court has not been provided with sufficient evidence to suggest that either of the parties [has] continuously or willfully denied the other's parenting time as defined by a prior order of this Court.

The Court further finds, from the totality of the credible evidence, that all of the parties hereto are likely to honor and facilitate Court-approved parenting time rights or visitation and companionship for [W.T.].

* * *

* * * [T]he Court-appointed Guardian Ad Litem herein opined that it is in [W.T.'s] best interest that [Paternal Grandparents] be designated as her legal custodians. He further opined that [Maternal Grandparents] would be the next best option for the Court to utilize in terms of a custody award. He also opined that [Father] would be the third best option for this child, in terms of custody.

While this Court appreciates the efforts of the Guardian Ad Litem herein and the significant time in [sic] which he invested in this case, it should be pointed out that he did not have the benefit of sitting through the remaining nine days of testimony in which he was not present. To this end, the Court respectfully disagrees with the ultimate recommendation of the Guardian Ad Litem for the reasons set forth herein.

Based upon its findings, the trial court awarded legal custody of W.T. to Father.

{¶ 8} Addressing the Maternal Grandparents' request for visitation, the trial court

made the following additional findings:

> In addition to the foregoing, the Court notes that [Maternal Grandparents] live in relatively close proximity to [Father], and the Court further notes that [Maternal Grandmother] has now retired from her prior employment as a pediatric nurse to enable her to not only take care of her grandson * * *, but also to be available to provide care for [W.T.].

> The Court notes that [W.T.] is enrolled in preschool in Enon which is a half-day program. [Father] testified that he utilizes a baby-sitter for all three of his children three days per week while he and his wife are working.

> The Court finds that it is in [W.T.'s] best interest to utilize [Maternal Grandmother's] availability to watch her in lieu of a baby-sitter, and more specifically, at the times set forth hereinafter.

> The Court further finds that it is not in [W.T.'s] best interest to be left alone with [Mother] until further order of this Court.

{¶ 9} The trial court ordered that Maternal Grandparents receive visitation on alternating weekends from Friday at the conclusion of W.T.'s "preschool (or subsequent school) (or 4:00 p.m. if there is no school) until the following Sunday at 6:00 p.m. (consistent with the current schedule being utilized)." In addition, Maternal Grandparents were to receive visitation "every weekday from after preschool (or school) at which time [Maternal Grandmother] will pick up the child from pre-school/school and keep the child until 5:30 p.m. at which time [Father], or his wife or other designee, will pick the child up from [Maternal Grandparents'] residence." Further, "during the summer or during the school year if the child does not have school scheduled on a given week day,

[Father] will drop off the child to [maternal grandmother] in the morning on his way to work, and he or his designee will pick the child up from the [grandparents'] residence at 5:30 p.m. that day. [Maternal Grandparents] will be responsible for transportation arrangements relating to their scheduled weekend visitations as well as scheduled holidays."

{¶ 10} As for holidays, the trial court ordered that the Maternal Grandparents would be entitled to visitation during those holidays designated for the non-custodial parent in the court's standard order of visitation. In the summer, the Maternal Grandparents would be entitled two weeks: (1) from 6:00 p.m. on the second Friday in June until the following Friday at 6:00 p.m., and (2) from 6:00 p.m. on the second Friday in July until the following Friday at 6:00 p.m.

{¶ 11} As for Mother, the trial court ordered that she would be entitled to "visitation/parenting time * * * at all times set forth herein for the benefit of her parents." However, Mother was not to be left alone with W.T. until further order of the court. Either Maternal Grandmother or Maternal Grandfather was required to be present at all times while Mother was in the presence of W.T.

{¶ 12} Father subsequently sought clarification of the Maternal Grandparents' visitation rights on school days and holidays. With respect to school days, the trial court ruled:

[I]t is this Court's intention that [Maternal Grandparents] be entitled to the visitations specifically set forth in this Court's Entry filed September 17, 2018, regardless of whether [Father], his wife, or any other third party is otherwise available to watch the minor child during this period of time and

also regardless of whether [Father] would prefer to utilize a babysitter to watch the minor child during the times set forth herein.

### III. Grandparent Visitation

{¶ 13} Father's first and second assignments of error challenge the trial court's orders granting visitation rights to Maternal Grandparents. They state:

1. The court erred as a matter of law granting visitation to [Maternal Grandparents].

2. The visitation times awarded to [Maternal Grandparents] are unreasonable, arbitrary, and inconsistent with the court's findings of fact.

{¶ 14} R.C. 3109.12(A) grants maternal grandparents the right to request "reasonable" visitation rights of a child born to an unmarried woman.[3] The trial court may grant the request if it determines that granting visitation rights is in the best interest of the child. R.C. 3109.12(B). In deciding whether to grant visitation to a non-parent, "the court shall consider all relevant factors, including, but not limited to, the factors set forth in division (D) of section 3109.051 of the Revised Code." *Id.*; *see also In re F.D.*, 2d Dist. Montgomery No. 23358, 2009-Ohio-4788, ¶ 7.

{¶ 15} R.C. 3109.051(D) sets forth the following factors to be among those considered:

(1) The prior interaction and interrelationships of the child with the child's parents, siblings, and other persons related by consanguinity or affinity, and

---

[3] When the father of the child born to an unmarried woman has acknowledged the child or paternity has been established, such as in this case, the paternal grandparents may also seek reasonable visitation rights. R.C. 3109.12(A). In this case, Paternal Grandparents' visitation rights are not at issue.

with the person who requested companionship or visitation if that person is not a parent, sibling, or relative of the child;

(2) * * * [I]f the person is not a parent, the geographical location of that person's residence and the distance between that person's residence and the child's residence;

(3) The child's and parents' available time, including, but not limited to, each parent's employment schedule, the child's school schedule, and the child's and the parents' holiday and vacation schedule;

(4) The age of the child;

(5) The child's adjustment to home, school, and community;

* * *

(7) The health and safety of the child;

(8) The amount of time that will be available for the child to spend with siblings;

(9) The mental and physical health of all parties;

(10) Each parent's willingness to reschedule missed parenting time and to facilitate the other parent's parenting time rights, and with respect to a person who requested companionship or visitation, the willingness of that person to reschedule missed visitation;

* * *

(12) In relation to requested companionship or visitation by a person other than a parent, whether the person previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a

child being an abused child or a neglected child; * * *

* * *

(14) Whether either parent has established a residence or is planning to establish a residence outside this state;

(15) In relation to requested companionship or visitation by a person other than a parent, the wishes and concerns of the child's parents, as expressed by them to the court;

(16) Any other factor in the best interest of the child.

R.C. 3109.051(D); *see also* R.C. 3109.12(B).

**{¶ 16}** Grandparents who seek visitation rights bear the burden of proving that visitation would be in the best interest of their minor grandchild. *See Harrold v. Collier*, 107 Ohio St.3d 44, 2005-Ohio-5334, 836 N.E.2d 1165, ¶ 45. Additionally, although not necessarily determinative, the factor set forth at R.C. 3109.051(D)(15) – i.e., "the wishes and concerns of the child's parents" – is entitled to "special weight." *Id.* at ¶ 44, citing *Troxel v. Granville*, 530 U.S. 57, 70, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *see also In re F.D.* at ¶ 7, quoting *Harrold*, paragraph one of the syllabus ("Ohio courts are obligated to afford some special weight to the wishes of parents of minor children when considering petitions for nonparental visitation made pursuant to R.C. 3109.11"). "Special weight" in that context has been interpreted to mean "extreme deference." *See In re N.C.W.*, 2014-Ohio-3381, 17 N.E.3d 119, ¶ 21 (12th Dist.).

**{¶ 17}** While recognizing the special weight to be given to a parent's wishes, we have emphasized that "[t]his does not mean that a parent's wishes regarding nonparent visitation necessarily will prevail." *In re F.D.* at ¶ 8; *In re T.N.M.W.*, 2d Dist. Miami No.

2018-CA-5, 2018-Ohio-4141, ¶ 20.   We explained:

> As the *Harrold* court recognized, "Ohio's nonparental visitation statutes not only allow the trial court to afford parental decisions the requisite special weight, but they also allow the court to take into consideration the best interest of the child and balance that interest against the parent's desires." *Id.*  "[W]hile *Troxel* states that there is a presumption that fit parents act in the best interest of their children, nothing in *Troxel* indicates that this presumption is irrefutable.   The trial court's analysis of the best interests of a child need not end once a parent has articulated his or her wishes.   By stating in *Troxel* that a trial court must accord at least some special weight to the parent's wishes, the United States Supreme Court plurality did not declare that factor to be the sole determinant of the child's best interest. Moreover, nothing in *Troxel* suggests that a parent's wishes should be placed before a child's best interest."   *Id.* at 51-52.

*In re F.D.* at ¶ 8.

{¶ 18} We review the trial court's grant of non-parent visitation for an abuse of discretion.  *In re T.N.M.W.* at ¶ 25.   An abuse of discretion occurs when the decision of a court is unreasonable, arbitrary or unconscionable.  *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶ 19} Upon review of the record, the trial court did not abuse its discretion in granting visitation to Maternal Grandparents.   Maternal Grandparents reside on 16 acres of property in Fairborn (Clark County); the property has multiple residential buildings, including a main residence, a duplex, two pole barns, and another house.   From W.T.'s

birth in June 2014 until the Paternal Grandparents obtained temporary custody of her in June 2017 (on W.T.'s third birthday), W.T. resided with Mother in the duplex on the property owned by Maternal Grandparents. Maternal Grandparents' home was approximately 200 feet away from Mother's residence. Maternal Grandmother testified that she saw W.T. "almost every day" while Mother had custody of W.T.

{¶ 20} At the time of the July 9, 2018 hearing date, Maternal Grandparents had visitation with W.T. from 1:00 p.m. to 7:00 p.m. on Tuesdays and Thursdays every other week and on Wednesdays during the alternating week. They also had W.T. from 6:00 p.m. on Friday until 6:00 p.m. on Sunday every other weekend. (Tr. Vol. 9 at 60.) Paternal Grandmother testified at that hearing session that she primarily communicates with Maternal Grandmother, and she discussed several text messages between the two where they worked out modifications to visitation as needed. Maternal Grandfather testified that he and Maternal Grandmother accommodated Father's requests for an accommodation due to a birthday party for Father's son.

{¶ 21} Maternal Grandmother, a registered nurse, formerly worked full-time at a pediatrician's office. In July 2016, Maternal Grandparents obtained legal custody of Mother's son, born in December 2016, with whom W.T. is close. After she obtained custody of Mother's son, Maternal Grandmother resigned her full-time nursing position, and she works only every fourth or fifth Saturday from 8:00 a.m. to noon. (Tr. Vol. 8 at 82.) Maternal Grandparents have a bedroom for W.T. in their house. During his testimony, Maternal Grandfather asked the trial court to consider Maternal Grandmother's availability in issuing parenting time orders.

{¶ 22} Father resides in Enon, a short distance from Maternal Grandparents'

residence.   At the time of the August 28, 2018 hearing, W.T. was enrolled in preschool in Enon.  (Tr. Vol. 10 at 36.)   Father testified on June 29, 2018 that he worked every weekday from 6:00 a.m. to 2:30 p.m. and sometimes Saturday.   His wife worked Monday, Wednesday, and Friday from 5:00 a.m. to 5:00 p.m.   Maternal Grandparents proposed at trial that they be granted legal custody of W.T. with "shared parenting" with Father.   (*See* Maternal Grandparents' Exhibit II.)

{¶ 23} During the sixth day of the hearing, Father was asked about W.T.'s future visitation with Maternal Grandparents.   When asked if he would cooperate with Maternal Grandparents to facilitate special occasions if he were given custody, Father responded "Yes, absolutely." (Tr. Vol. 6 at 60.)   When Father was later asked about Maternal Grandmother's watching W.T. instead of a babysitter while he worked, Father indicated that he was willing to "work something out," particularly if Maternal Grandmother would watch all three of his children.   Father was subsequently asked if he objected to Maternal Grandmother's taking W.T. to or picking W.T. up from pre-school.   Father responded, "I don't think that it couldn't happen."   (Tr. Vol. 6 at 112.)   Father expressed that, if he got custody of W.T., he thought Mother and Maternal Grandparents should have a standard order of visitation (Tr. Vol. 6 at 92), and that Mother should share the visitation with her parents.

{¶ 24} All parties recognized that W.T. loves her parents and her grandparents. The parties provided unrefuted testimony that W.T. has positive, loving relationships with her siblings and extended family on both sides of her family.   Father, Paternal Grandmother, and Maternal Grandmother each testified that it was important for W.T. to maintain her relationships with both sides of the family, including her half-siblings.

Father expressed a desire that his children remain together; Mother expressed similar sentiments. The evidence reflects that W.T. was healthy and happy and had received good care from both sets of grandparents.

{¶ 25} Given W.T.'s residential history, W.T.'s relationships with her parents and grandparents and other family members, W.T.'s age, the family members' work obligations, and the close proximity between Father's and Maternal Grandparents' residence, the trial court did not abuse its discretion in determining that visitation with W.T.'s Maternal Grandparents would be in W.T.'s best interest.

{¶ 26} In his appellate brief, Father asserts that the trial court improperly applied the factors set forth in R.C. 3109.04 in determining whether to grant visitation to Maternal Grandparents and that the trial court gave no consideration to Father's wishes. The trial court's ruling on Maternal Grandparents' motion for visitation did not enumerate the factors which the trial court considered, nor did it expressly state that it considered the wishes of the parents. However, the court made extensive findings related to the motions for legal custody, and the court indicated that it was incorporating those findings in reaching its visitation order.

{¶ 27} The fact that the trial court provided substantial visitation to Maternal Grandparents does not require the conclusion that trial court ignored the wishes of the parents; both parents testified that they wanted their children to be together, and Maternal Grandparents had legal custody of Mother's son. Father expressly testified that he thought Mother and her parents should have a standard order of visitation (as opposed to no visitation), and that he was willing to work with them regarding holidays and times he would need a babysitter. The evidence before the trial court indicated that Father had

no objection to Maternal Grandparents' having some amount of visitation with W.T. and, further, agreed that continued contact between W.T. and Mother's family was important. And, given that W.T. saw Maternal Grandparents nearly every day for the first three years of her life, the trial court reasonably concluded that some award of visitation to Maternal Grandparents was appropriate.

{¶ 28} Father's primary objection appears to be the amount of visitation that Maternal Grandparents received, which was more than the standard order of visitation and more than the visitation that Maternal Grandparents had received when Paternal Grandparents had temporary custody.[4] Father asserts that the trial court's award of substantial visitation was arbitrary and inconsistent with the trial court's findings of fact. In particular, Father claims that the Maternal Grandparents' visitation from after school until 5:30 p.m. on weekdays precludes him (Father) from arranging doctor appointments, registering W.T. for extracurricular activities, scheduling after-school lessons or tutoring, and the like.

{¶ 29} We find nothing in the trial court's order that would preclude Father from arranging for after-school extracurricular activities for W.T., although Maternal Grandparents would have the responsibility to ensure that W.T. was transported to those activities if they occurred during their visitation time. Nor did the trial court's order imply that Father could not make necessary medical, dental, or other health-related appointments for W.T., given the trial court's finding that Father was likely to adequately

---

[4] In its ruling, the trial court noted that Maternal Grandparents' exhibit indicated that they would agree to "shared parenting" with Father if they were given legal custody. The court noted that Maternal Grandparents had not requested shared parenting in their pleadings nor had they submitted a shared parenting plan. The court stated that, under the circumstances, it was not authorized to grant shared parenting.

attend to all of W.T.'s medical, health and future educational needs. The court's findings reflected an expectation that the parties would "honor" and "facilitate" visitation and companionship with W.T., and that the parties would work together, in the best interest of W.T., to accommodate any necessary weekday appointments that might arise periodically.

{¶ 30} Through its judgments, the trial court established a school-year visitation schedule where W.T.'s weekday routine with Maternal Grandparents and Father was consistent. And, the trial court's order provides W.T. with nearly equal time with her half-siblings throughout the school year, consistent with the strong desire of both parents that W.T. be raised with her siblings.

{¶ 31} Based on our review of the record, we conclude that the evidence supports the trial court's decision to allow the substantial grandparent visitation that it ordered, and that the decision was not an abuse of discretion.

{¶ 32} Father's first and second assignments of error are overruled.

### IV. Mother's Parenting Time

{¶ 33} Father's third assignment of error states:

The parenting time order for [Mother] is contrary to law and not supported

by the evidence.

{¶ 34} Father claims that the trial court failed to conduct the required analysis in determining Mother's parenting time. He notes that the court made no separate findings concerning the parenting time order for Mother, other than that Mother devotes most of her time to her recovery, and that Mother's parenting time "rides on the coat-tails" of Maternal Grandparents.

**{¶ 35}** Although the trial court did not make extensive findings regarding Mother's parenting times specifically, the trial court found that Mother resided at the same property as her parents, and consequently was able to spend significant time with her son, of whom Maternal Grandparents had custody. The court recognized that Mother was focusing on her recovery, that her parents were "a tremendous support source for her," and that she appeared motivated to "fix things in the personal life so that she can be a positive part of [her children's] lives." Mother was W.T.'s custodial parent for the first three years of W.T.'s life. The court found that Mother "clearly loves her children," but believed that Mother should not be with the children unsupervised. Given the trial court's findings, the court reasonably granted Mother parenting time while W.T. was with Maternal Grandparents for visitation, provided that one of Mother's parents was present at all times while Mother was in the presence of her children.

**{¶ 36}** Father's third assignment of error is overruled.

### V. Conclusion

**{¶ 37}** The trial court's judgments will be affirmed.

. . . . . . . . . . . . .

HALL, J. and TUCKER, J., concur.

Copies sent to:

Valerie Juergens Wilt
Stacey Robert Pavlatos
James Griffin, GAL
A.B.
K.T. & P.T.
Hon. Thomas J. Capper